Mills vs. Gleason.

## MILLS vs. GLEASON.

### APPEAL FROM COUNTY COURT, DANE COUNTY

Heard February 7th.]                                    [Decided July 10, 1860.

### Corporations— Taxes.

A subsequent ratification, by a municipal corporation, will render valid acts which in strict point of law were unauthorized at the time they were done, for want of a publication of the charter.

When the charter of a municipal corporation confers the power to purchase fire apparatus, cemetery grounds, to establish markets, and do many other things, for the execution of which money would be a necessary means : it would, in the absence of any positive restriction, confer the power to borrow money as an incident to the execution of these general powers.

The fact that the legislature, have at various times passed acts authorizing municipal corporations to borrow money, for purposes clearly municipal, though entitled to consideration, is not conclusive upon the question of the right of the corporation to borrow money.

The power of taxation conferred by the charter upon a municipal corporation, does not exclude the power of borrowing money.

Where the charter of the city of Madison provided that the common council, should consist of the mayor, and twelve aldermen, and that to levy a tax the vote making the levy should be passed by two-thirds of the members elect; held, that a vote to levy a tax, passed by eight aldermen, was properly passed, and the mayor was not to be counted in such voting.

No objection which does not go to the very ground work of a tax, so as to affect materially its principle, and show that it must necessarily be illegal, ought to have the effect of rendering the whole invalid.

This action was commenced by Simeon Mills to restrain the defendant, Gleason, the treasurer of the county of Dane, from selling the lands of the plaintiff lying in the city of Madison, for the taxes of the year 1857. The complaint averred that the plaintiff was the owner, &c.. of the lands on which the tax was levied; and that the defendant claimed there was due upon them $1,049,88, for the non-payment of which Gleason had advertised the same for sale. It also stated, that the taxes appeared fair upon the tax duplicate and return made to the county treasurer, and so was a cloud

upon the title of the lands; but averred irregularity and illegality in the levying and assessment of the taxes in several particulars: 1. There was no equalization of the assessment roll made, either by the assessors, or the common council of the city, for that year. 2. The assessors of the city neglected to meet on the first and second Mondays in June, for the purpose of hearing objections by those parties who felt themselves aggrieved by the assessment. 3. After the assessment roll had been filed with the city clerk, and after it had been approved by the common council, material alterations were made in it, without any authority of law; and the property contained and described in the tax roll, and the tax duplicate does not correspond; but a large amount of personal property set down and assessed to divers persons in the city, and amounting to $20,000 contained in the assessment roll, had been omitted from the tax duplicate, and upon which no taxes had been levied for the year. 4. The common council consisting of a mayor and 12 aldermen, did not meet on the first Monday of July, 1857, nor within ten days thereafter and determine the amount of taxes to be levied for general city purposes, &c., nor did they at any time by a vote of two-thirds of all their members, as required by the charter of the city, adopt any resolution levying any tax. 5. Large sums were included and embraced in the tax list, and for whichin part, the lands of the plaintiff were threatened to be sold, for objects and purposes for which the common council had no power or lawful authority to levy a tax upon the property of the plaintiff. 6. The treasurer of the city did not return the delinquent tax list on the 7th of July, as he was required to do by law. 7. The board of supervisors for the county of Dane, unlawfully increased the total amount of the assessed value of the property of the several towns; and unjustly added to the assessed value of the taxable property of the city of Madison, $167,912. On this complaint he asked for an injunction to restrain the sale.

The defendant answered by a general denial. And the trial was had before the court without a jury. The plaintiff proved his title to the lots, &c., and then introduced the assessment roll of the first ward, and pointed out several erasures and changes, and omissions of personal property not included in the tax list, which was also introduced. He also called Elisha Burdick, who testified that, he called at the common council chamber on the first Monday of June, 1857,

Mills vs. Gleason.

and was unable to find more than one assessor of the city there, at any one time. He was there the greater part of the day for the purpose of making objections to their assessment and having the same corrected. On the second Monday of June, he was also there for a like purpose the greater part of the day. At one time three of the assessors were present for a short time during the day; the assessor of the first ward was not present at any time during either of those days. He called the attention of the individual assessors to several things which he desired them to attend to, but they had no organized meeting and did not act upon the matters.

The plaintiff then read from the proceedings of the common council on the 8th of June, 1857, held specially to consider the finances of the city, at which meeting there was present the mayor and nine aldermen; but before acting upon the matters, the council adjourned. On the 29th, the business was again taken up, and the items for $13,341, for outstanding liabilities, and of $12,650 for interest on city loans, were each ordered to be raised by a vote of all the twelve aldermen. On the question to raise $5,500 for streets, the vote was, 8 aldermen, aye, and three, no. On the question to raise $3,200 for fire department, there were 9 ayes. On the question to raise $8,199 99 for school purposes, there were 9 ayes, and 2 noes. On the question to raise $2,600 for salaries of officers, &c., there were 11 ayes. On the question to raise $8,000 for contingent expenses, there were 10 ayes. Making a total tax ordered of $59,190 99, to be raised. The record further showed that the assessment roll had been referred to a committee of the aldermen, who reported in favor of reducing the entire amount of the personal property of the city from $1,020,577 to $889,116. After several motions to amend this report it was rejected, and the assessments as made by the assessors adopted by the council. On this vote there were 8 ayes, and 1 no; and a resolution adopted, that a tax of six per cent. be levied upon the assessment roll as adopted by the council. The resolution passed by a vote of 8 ayes, and 1 no.

The plaintiff then called a witness, one of the aldermen, who testified, that the item in the tax, for interest, was made as follows: For interest on $100,000, municipal loan, $8,000; for interest on capitol bonds, issued by the city of Madison, to the amount of $50,000, $3,500; for interest on bonds issued to John Wright, to pay for cemetery grounds, to the amount

of $10,000, $800, and the balance of the item of $12,350 was raised to pay interest on certain city orders, issued by the city, the whole being called the municipal loan. These bonds were issued for the purpose of procuring money to erect city buildings, and for general city purposes. The ordinance making this loan was passed in May, 1856, by a vote of 8 ayes, and 1 no. The $100,000 were sold so that the city realized between $73,000 and $74,000.

The plaintiff then proved the return of the taxes as delinquent, and the amount; also the advertising of the lands for sale. He also produced a file of the " Argus and Democrat," and read an ordinance therefrom published by authority, for the purchase of a city cemetery, at $10,000 for 80 acres of land.

The defendant then read the several assessment rolls for 1857, the tax lists, warrants and certificates, and return to the county treasurer, and the advertisement of sale, and the affidavits of publication, &c. He also called the city clerk, who testified that he compiled the tax from the assessment rolls at six per cent., and used as a basis of calculation the assessment as equalized by the committee of the common council, and not the original returns of the assessors. The defendant also read the ordinance for a loan of $100,000, and the report of the committee to sell the bonds; also the proceedings for the purchase of the cemetery grounds. He also proved by the mayor of the city, that the proceeds of the $100,000 were expended in the purchase of school house sites, building school houses, city hall, improving streets, and for general city purposes. The deed from the cemetery grounds was dated 23d of February, 1857, and delivered on that day to the mayor; the bonds to pay for it were not issued until the 28th of March, because they could not be lithographed before that time. The receipts for the deed and the bonds, also the deed, was introduced and read in evidence.

One of the assessors then testified to the meeting of the assessors to equalize the assessments, and that he was chairman of the board of equalizers. They were not all present at any one time. He knew that the personal property of the 2d ward as returned by him amounted to $18,275. The alterations in the roll were not made by him, but were made without his knowledge.

The county court found as follows:

" 1.   I find the following facts to have been fully proved

by the said plaintiff, viz: That the said plaintiff was, at the time of making the complaint in this action, and still is the owner, and was then and still is possessed in fee of the following described lots and parts of lots in the city of Madison, in said county, and as such owner, was and is bound for the payment of all the taxes legally assessed and levied thereon for the year 1857, viz: (Here followed a list of the lots on which the taxes were assessed.)

"I find, as a further fact, proved, that the defendant, as treasurer of said county, did, at the time of making said complaint, pretend, and still does pretend, that according to the return of the delinquent taxes, made to him as the treasurer of said county of Dane, by one Fred. Southoff, former treasurer of said city, on or about the 26th day of July, 1858, there appears to be charged, and that by said return there does appear to be charged upon, and stand against the lots above named, as and for pretended delinquent taxes for said year 1857, the amounts set opposite said several lots as follows: (Here follows a list of the lots, and the tax on each.) Amounting in all to the sum of one thousand six hundred and forty-nine dollars and eighty-eight cents; that the said defendant pretends and claims that said sums were legally assessed and levied thereon as taxes for the year 1857, by the city of Madison aforesaid; and that the defendant, as such treasurer, did, on or about the first day of August, A. D. 1858, give public notice, by publishing the same in the "State Journal," a newspaper printed at Madison aforesaid, and by posting up the same in various public places in said city; that he would, as such treasurer, on the 14th day of September, A. D. 1858, sell at public auction, the aforesaid lots of land, or so much thereof as might be necessary for the payment of the aforesaid sums so claimed to be due as taxes thereon.

"I do further find as a fact proved, that all of the aforesaid pretended taxes as charged against said lots for said year, 1857, and for the non-payment of which, said defendant was proceeding to sell said lands, were those claimed to have been levied and charged by the said city of Madison for said year, 1857.

"And I find as a fact further proved, that no equalization of the assessment rolls of the several wards of said city for said year, 1857, was made, either by the assessors or the common council of said city; and that said assessors did not meet either on the first and second Mondays of June of said

year, 1857, nor on any other day at the common council room of said city, or elsewhere, for the purpose of hearing objections of parties deeming themselves aggrieved by the assessment of said assessors.

" I find as further facts proved, that after the said assessment rolls of the four wards of said city of Madison had been made out and returned to the common council of said city, and deposited with the clerk thereof by the assessors for said year, 1857, an order approving the same as so returned, had been entered of record in the proceedings of the common council of the city; material alterations were made in such assessment rolls without any legal warrant or authority, and that the property described in the tax list of said city for the year 1857 aforesaid, upon which the taxes for said year were made out and subsequently returned to the county treasurer as aforesaid, upon the delinquent list of which the said county treasurer was proceeding to sell as aforesaid, did not correspond with, and was not the same property contained and described in the assessment roll of said city for said year, 1857; and that after said assessment roll had been filed with the city clerk, and an order approving the same had been entered of record as aforesaid, large amounts of personal property set down and assessed in said assessment roll to divers persons in said city, amounting to twenty thousand dollars and upwards, were omitted in the said tax list for said year, 1857, without any legal warrant or authorty, and that said alterations and omissions were not immaterial or clerical errors or omissions, but that the same were made with a deliberate design to perpetrate a fraud upon a portion of the tax-payers of said city for the benefit of others.

" I further find, as a fact proved, that the common council of said city did not, on the first Monday of July, in the said year, 1857, or within ten days thereafter, or at any other time during said year, by a vote of two-thirds of the members elect of the common council of said city, determine the amount of taxes to be levied for general city purposes and for school purposes; and that said common council did not levy, at any time during said year, 1857, by resolution, adopted by a vote of two-thirds of the members elect of said common council, or in any other lawful manner, any tax for either general, city, or school purposes.

" I also find, as a further fact proved, that there was included in the tax, which said common council of the city of

Madison undertook to levy for the year 1857, and for which the said defendant, as treasurer of said county, was proceeding to sell said premises—the sum of eight thousand dollars to pay interest for said year upon one hundred bonds of one thousand dollars each, which said common council had caused to be issued and put into the market in New York city and sold, in the year 1856, purporting to bind and obligate said city of Madison, and the property and revenues thereof for the payment of the principal and interest of said bonds—and that said tax also included the sum of eight hundred dollars, for the payment of interest on ten bonds, or what purported to be bonds of said city, issued on or about the 26th day of the month of February, A. D., 1857, to one John Wright—all of which said bonds I find to have been issued without any authority of law; that neither the charter of said city, nor any law of this state, authorized or empowered the common council of said city to issue said bonds, or make the same or sell the same in market or otherwise, and that said bonds are, therefore, void as against said city.

" I find as a further fact proved, that nearly all of said one hundred bonds, first above mentioned, were sold by N. B. Van Slyke, who claimed to act on behalf of said common council, at a rate greatly below par, so that the nett proceeds thereof was between seventy thousand and seventy-five thousand dollars.   I find, as a further fact proved, that the treasurer of said city of Madison did not, on the 7th day of July, 1858, or at any time before that date, return to the treasurer of said county a list of lands and lots in said city of Madison, upon which the taxes for the year, 1857, had not been paid; but I find that one Fred. Sauthoff did, on the 27th day of July, 1858, return said tax list to the treasurer of said county, and which is the same list upon which the said county treasurer was proceeding to sell the premises aforesaid; and I further find, that at the time of such return, the said Sauthoff was not treasurer of said city.

2.   I therefore decide, as conclusions of law, that the pretended tax, for the non-payment of which the said defendant, as treasurer of said county as aforesaid,was proceeding to sell the lands and lots described in the complaint, was not legally levied, and that the said lots were not, and are not legally chargeable with the payment thereof.   That the aforesaid one hundred and ten bonds of $1,000 each, were issued without any adequate authority of law, and were and are

void, and of no validity or effect as against said city, and that any tax which the common council of said city, or other officers thereof, might levy for the purpose of paying the interest or principal of said bonds, is also illegal and void, and ought not to be enforced. That the said defendant, Ezra H. Gleason, treasurer as aforesaid, and his successor and successors in office should be restrained by the injunction of this court from enforcing the payment and collection of said pretended tax against the plaintiff, either by the sale of said lands or otherwise; and that the said defendant and his successor and successors in office, and all others claiming to act under his or their authority, should be forever restrained and enjoined from selling said lands or any part thereof, by reason of the non-payment of said pretended tax, or any part thereof.

To which said decision the defendant excepted as follows:

The above named defendant hereby excepts to so much of the finding of the court in this cause as to the facts in this action as follows: "And I find as a fact further proved, that no equalization of the assessment rolls of the several wards of said city for said year, 1857, was made, either by the assessors or the common council of said city, and that said assessors did not meet either on the first and second Mondays of June of said year, 1857, nor on any other day at the common council room of said city or elsewhere, for the purpose of hearing objections of parties deeming themselves aggrieved by the assessment of said assessors," and to each and every part and portion thereof.

And the said defendant further excepts to so much of the said finding as to the facts in this action, as read as follows: "I find, as further facts proved, that after the said assessment rolls of the four wards of said city of Madison had been made out, and returned to the common council of said city, and deposited with the clerk thereof, by the assessors, for said year 1857, and an order approving the same as so returned had been entered of record in the proceedings of the common council of the city, material alterations were made in such assessment rolls, without any legal warrant or authority, and that the property described in the tax list of said city for the year 1857 aforesaid, upon which the taxes for said year were made out and subsequently returned to the county treasurer as aforesaid, and upon the delinquent list of which the said

county treasurer was proceeding to sell as aforesaid, did not correspond with, and was not the same property contained in and described in the assessment roll of said city for said year 1857; and that after said assessment roll had been filed with the city clerk and an order approving the same had been entered of record as aforesaid, large amounts of personal property set down and assessed in said assessment roll to divers persons in said city amounting to twenty thousand dollars and upwards, were omitted in the said tax list for the said year 1857, without any legal warrant or authority, and that said alterations and omissions were not immaterial or clerical errors or omissions, but that the same were made with a deliberate design to perpetrate a fraud upon a portion of the tax-payers of said city, for the benefit of others. I further find, as a fact proved, that the common council of said city did not, on the first Monday of July, in said year 1857, or within ten days thereafter, or at any time during said year, by a vote of two-thirds of the members elect of the common council of said city, determine the amount of taxes to be levied for general city purposes, and for school purposes; and that said common council did not levy, at any time during said year 1857, by resolution, adopted by a vote of two-thirds of the members elect of said common council, or in any other lawful manner, any tax, for either general, city or school purposes," and to each and every part and portion thereof.

And the said defendant further excepts to so much of the said finding, as to the facts in this action, as reads as follows: " all of which, said bonds, I find to have been issued without any authority of law," and to each and every part and portion thereof.

And the said defendant further excepts to so much of the said finding as to the facts in this action, as reads as follows : " That neither the charter of said city nor any law of this state authorized or empowered the common council of said city to issue said bonds, or make the same, or sell the same in market or otherwise, and that said bonds are therefore void as against said city," and to each and every part and portion thereof.

And the said defendant further excepts to so much of the said finding, as to the facts in this action, as reads as follows : " I find, as a further fact proved, that nearly all of said one hundred bonds, first above mentioned, were sold by N. B.

Van Slyke, who claimed to act on behalf of said common council, at a rate greatly below par, so that the nett proceeds thereof were between seventy thousand and seventy-five thousand dollars" and to each and every part and portion thereof.

And the said defendant further excepts to so much of the said finding, as to the facts in this action, as reads as follows: "I find, as a further fact proved, that the treasurer of the said city of Madison did not, on the 7th day of July, 1858, or at any time before that date, return to the treasurer of said county, a list of lands and lots in said city of Madison, upon which the taxes for the year 1857 had not been paid, but I find that one Fred. Sauthoff, did, on the 27th day of July, 1858, return said tax list to the treasurer of said county, and which is the same list upon which the said county treasurer was proceeding to sell the premises aforesaid," and to each and every part and portion thereof.

And the said defendant further excepts to so much of the said finding, as to the facts in this action, as read as follows: "And I further find that at the time of such return the said Southoff was not treasurer of said city," and to each and every part and portion thereof.

And the said defendant further excepts to so much of the conclusions of law, drawn by said court in this action, as reads as follows: "I therefore decide, as conclusions of law, that the pretended tax, for the non-payment of which the said defendant, as treasurer of said county as aforesaid, was proceeding to sell the lands and lots described in the complaint, was not legally levied, and that said lots were not, and are not legally chargeable with the payment thereof," and to each and every part and portion thereof.

And the said defendant further excepts to so much of the conclusions of law, drawn by the said court, as reads as follows: That the aforesaid one hundred and ten bonds of $1,000 each were issued without any adequate authority of law, and were and are void, and of no validity or effect as against said city, and that any tax which the common council of said city, or other officers thereof, might levy for the purpose of paying the interest or principal of said bonds, is also illegal and void, and ought not to be enforced," and to each and every part and portion.

And the said defendant further excepts to so much of the conclusions of law, drawn by the court in this action, as

reads as follows: That the said defendant, Ezra H. Gleason, treasurer, and his successor and successors in office, should be restrained by the injunction of this court from enforcing the payment and collection of said pretended tax against the plaintiff, either by the sale of said lands or otherwise; and that the said defendant and his successor and successors in office, and all others claiming to act under his or their authority should be forever restrained and enjoined from selling said lands or any part thereof, by reason of the non-payment of said pretended tax, or any part thereof," and to each and every part and portion thereof.

The judge also gave his reasons for his jugment, as follows:

In this case relief is asked by the plaintiff from the payment of certain taxes alleged to have been improperly assessed and levied against him, and judgment is demanded of this court upon the case stated in the complaint, restraining the defendant, his successors in office, etc., from selling or offering for sale, lands of the plaintiff, described in his complaint, for such taxes, illegally, irregularly, and improperly levied, assessed, etc., as aforesaid, as he alleges.

Upon the question of fact involved, I find the averments of the complaint sustained by the proof, in this: That the plaintiff owned, was possessed of, and had a valid subsisting interest in the lots and parcels of land described in his petition, and was bound for the payment of all taxes legally assessed and levied for the year A. D. 1857. I find that the treasurer of Dane county, before the filing of the petition by the plaintiff in the case, had advertised said lots and parcels of lands for sale, for the delinquent taxes of that year, as in the petition alleged.

.It appears from the evidence that no equalization of the assessment roll of said city of Madison was made, either by the assessor or the common council of the city, before the levying of any tax upon such assessment roll for the year 1857.

It appears that the assessors of said city of Madison neglected to meet on the first and second Mondays of June, A. D. 1857, at the common council room, in the city of Madison, for the purpose of hearing any objection of any parties deeming themselves aggrieved by such assessment. The law, in express terms, requires an equalization of an assessment roll, before levying the tax upon the same; and it also

required the assessors to meet on the first and second Mondays of June, 1857, to hear and settle objections to the assessment by aggrieved parties. Two important necessary steps required by law to be taken, in order to make a perfect legal obligatory assessment, were here omitted by public officers. It is as necessary, under the law, to ensure a legal assessment, to have an equalization of the assessment, as to have an assessment at all, and it was equally necessary to a correct legal and binding assessment in this case, that the assessors of the city of Madison should have met on the first and second Mondays of June, 1857, to hear complaints of aggrieved parties, and to correct the assessment roll, if corrections were necessary. The law required the duties of the public officers, and that is sufficient argument to prove its necessity. The power of taxation is an arbitrary power, and therefore its exercise must conform strictly with the rules prescribed by the laws authorizing or regulating it; otherwise, there is no security for the rights of property of the citizens. Men cannot be charged with the payment of taxes except for legitimate purposes of government, and the property of the citizen cannot be condemned and sold for default in the payment of taxes, except when the property is assessed and the taxes levied in strict and exact conformity to the law.

It further appears in this case, that after the assessment roll of the city for the year 1857 had been filed with the city clerk, and an order approving the same was entered of record in the proceedings of the common council of the city, material alterations were made in such assessment roll, without any legal warrant or authority, and that the property described in the tax roll or duplicate of taxes of the city of Madison for the year 1857, and upon which the taxes of said year were levied, did not correspond and was not the same property contained and described in the assessment roll of the city for that year; and that after said assessment roll had been filed with the city clerk, and an order adopting and approving the same had been entered of record in the proceedings of the common council of the city, a large amount of personal property set down and assessed to divers persons in said city, amounting to twenty thousand dollars and upwards, contained in said assessment roll after the same had been approved and adopted as aforesaid, was omitted in the duplicate of taxes or tax roll of property in said city, and upon which the taxes for the year '57 were made out by the said

Vol. XI.                    **31**

city clerk, and were claimed at the time of filing this complaint by the defendant to be legally chargable against the real estate of the plaintiff described in the complaint, and for which the defendant threatened to sell the real estate of this plaintiff.

These alterations could not have been innocent errors; here was a deliberate attempt to perpetrate a bold, palpable fraud, either by public officers or other designing persons, who had access to the records, upon a portion of the tax-payers of the city of Madison.

It was not an omission of a mere ministerial duty, but a violation of law, of the most flagrant character, and the alterations and official omissions rendered null and void every step taken from that time onward by either the city officers or county treasurer, so far as they affected innocent parties, whose taxes were increased by such alterations and omissions.

It further appears to the court, that all the facts charged in the fourth, fifth and sixth divisions of the complaint are sustained by proof. Said allegations are as follows:

4th allegation of the complaint charges that no tax was levied for general, city or school purposes, for the year 1857, by a vote of two-thirds of the common council, as required by the city charter.

5th allegation charges that some portion of the pretended tax purports to have been levied for objects and purposes not authorized by the charter, and for which the common council had no power to levy a tax on the property of the complainant.

6th allegation charges that the treasurer of the city of Madison did not make a return of the delinquent taxes of the city of Madison for the year 1857, to the county treasurer, as required by law.

The law in certain contingencies, and upon certain preparatory steps, in case of default in the payment of taxes, authorizes the sale of lands taxed, and upon failure to redeem, gives the purchaser of such land, at tax sale, a deed of conveyance of the same.

Here, by certain processes, the lands of A may be taken from him, and, to meet a public necessity, given to B. To perfect the title in B., it is necessary that each requirement of the law, from the act of assessing to the act of executing the deed, be faithfully performed. This succession of official acts

constitutes the chain of title from A to B, and if any link in that chain is wanting, the title fails in B. Whatever act done in violation of the law, or whatever act left undone, which the law requires as essential, that would defeat a title in B., under a tax deed, would be, must be, and is a good defense against the collection of the tax, or the sale of the land by the treasurer, for the tax. Errors, whether intentional or unintentional, equally work a hardship, and are equally a fraud as to the payers.

The property of the state should pay the taxes of the state. The burthens of government, either town, city, or state, should be shared by all. Each and every citizen should pay his proportion of necessary public expenses, according to the amount and value of the property he possesses. Whenever by accident or design one class is improperly relieved, the other class is improperly loaded down and oppressed. The law abhors oppression and wrong as to the rights of property as well as persons, and it is the business of law and of the courts administering the law, to redress grievances and to protect the rights of the people. There is a political remedy for some of these evils. It can be found in the selection of honest, capable, and faithful citizens for offices of trust and responsibility; until the people do this, they have no business to complain; and until they do this, courts will be constantly invoked to furnish relief from schemes of fraud, official chicanery, or official ignorance.

The bonds issued to John Wright were not only issued without authority, but in direct violation of law.

Before the issue of those bonds the city authorities had been prohibited by the legislature from making such issues. The city had a right to buy of John Wright cemetery grounds, and had a right to pay for what it bought, but the city authorities could not avoid an express statute by ante-dating bonds issued even to conform to previous contracts. The time of the execution of the bonds, and not the date of the bonds, is to determine the question. Those bonds were void.

A municipal corporation is a creature of law. It has no attribute of sovereignty. Through its officers it can do just what the law authorizes it to and nothing more. Its authority is delegated, and it can exercise no incidental power except such as is absolutely necessary to the full enjoyment and exercise of that delegated authority.

It has no right to create permanent public debts of large

amounts running through long years, burthening as well the present generation as coming generations, and in no case has the city authority to create a bonded debt for general city purposes. Each year must be made to pay the expenses of itself.

But independent of this consideration, even where a city might be authorized by the charter to issue bonds, there is no case where the public authorities are authorized to sell, transfer, or dispose of them below par value. They are to the city as money, every sale of a city bond for a sum less than its nominal value upon its face, is a fraud upon the city, and the man who makes the sale for the city, and the man who buys becomes a party to the fraud. In case of the sale of the municipal bonds for the city of Madison, undoubtedly they were honestly made, yet as to the tax-payers of the city they were a fraud. If the city had been authorized to issue bonds for general city purposes, which it was not, the city would be under no obligation to pay in redeeming the bonds, more than it received for them, nor to pay interest on any sum beyond what was realized in their sale. Every man who buys corporate securities must buy with his eyes open and take his own risk in making his contract. Unless the charter authorizes in express terms the creation of a bonded debt for general city purposes, the issue of bonds for such purposes is void.

I find in the charter of the city of Madison no authority to issue any such bonds; taxes to pay the principal or interest on such bonds are therefore illegally and improperly issued.

I have no question from my examination of the authorities of the power of the court to interfere by injunction in such cases. By the operation of the code the distinction between actions at law and suits in equity is done away, and a party can no longer be sent " from a court of equity to a court of law." Independent of the new order of things under the code, there would be, in my judgment, no question about the power of the court in the exercise of an equity jurisdiction to prevent wrongs of this kind, a party in interest is not compelled to wait until his property is improperly encumbered and his title clouded, before he can move to right himself.

If it would be wrong and in violation of law for the treasurer to make a sale in this case, the plaintiff has a right upon proper showing, to prevent that wrong.

The law powers of the court might redress a wrong, that

Mills vs. Gleason.

only the equity powers of the court could prevent. There is no mode, except by injunction or the voluntary act of the treasurer, that could prevent the sale in this case, and a consequent cloud upon the title of the plaintiff to the lands in question. If he could file his complaint to clear the title after it is clouded, he can ask the judgment of this court to prevent its incumbrance. It is only by the exercise of an equity jurisdiction that the court could relieve the plaintiff in this case if the sale had already taken place and the certificates of sale or tax deeds been executed and issued. I therefore conclude this court has power to stop that being done, which if done, it would have power to undo.

The questions involved in this case are of very grave importance, and should be fully considered by the supreme court. The powers of city corporate authorities to create debts, to levy and collect taxes, to issue bonds, &c., ought to be adjudicated upon and better understood everywhere all over the country, in all the cities. Credit is prostrated and tax payers directly or indirectly plundered, without any discovered means of redress, except by an unpopular resort to courts of justice. It is an age in which every officer is his own lawyer, and every citizen knows better the duties and obligations of a public officer, than the officer himself; in which an unwarranted assumption of corporate or judicial power and authority has ceased to excite surprise, in which the public wrong doer has the passport to popular favor, and public censure falls upon those who seek to redress grievances, to protect rights and prevent evils. It is high time that reforms in the law and in its administration were brought about, and that officers and citizens pay more regard to their public duties and public and private obligations.

The relief asked for in this case in the complaint of the plaintiff, must be granted."

Judgment was entered upon this finding, and the defendant appealed.

*S. U. Pinney* for the appellant, upon the point that the city could contract debts, to accomplish any object within the scope of its corporate existence, and gives its notes and obligations for such debts, cited the following: *Ketchum vs. The City of Buffalo*, 4 Kern., 356; *State vs. City of Buffalo*, 2 Hill, 434; *Halstead vs. City of New York*, 5 Barb., 218; Constitution, Art XI, § 3; *State ex rel. Dean vs. Common Council of Madison*, 7 Wis., 688; Charter of City, chap.

21, § 1; chap. 7, §§ 3, 5, 22; *Madison &c., Plk. Road Co. vs. Watertown &c., Plk. Road Co.*, 5 Wis., 173; *Farmers & Mech. Bank vs. Butchers & Drovers Bank*, 4 Kern., 623; *Commissioners of Knox Co. vs. Aspinwall*, 2 How., 539; 5 Ellis & Black. 245; 25 Eng. Law and Eq., 114.

*Abbott & Clark* for the respondent.

When the charter is silent as to what contracts a corporation may make, as a general rule, it has power to make all such contracts as are *necessary* in the course of business, as means to enable it to *attain the object for which it was created and none other.*   Angell & Ames·on Corporations, 245; *Broughton vs. Manch. Water Works Co.*, 3 Barn. & Ald., 12; *People vs. Utica Ins. Co.*, 15 John., 383; *N. Y. Fireman's Ins. Co. vs. Ely*, 2 Cow., 699; Same vs. Same, 5 id. 568; *Lessee of Knowles et al., vs. Beatty*, 1 McLean, 43; *Bussey vs. Gilmore*, 3 Green., 191; *Lisbon vs. Bath*, 1 Foster, 319; *Stetson vs. Kempton*, 13 Mass., 272.

A corporation cannot be made liable for the acts of its agents, not within its corporate powers, even though such acts be ratified by the directors.   *McCulough vs. Moss*, 5 Den., 567; *Boon vs. City of Utica*, 2 Barb., 104; *Hodges vs. City of Buffalo*, 2 Den., 110; *The Mayor &c., of Albany vs. Canliff*, 2 Comst., 165; *New London vs. Brainard*, 22 Conn., 552.

The question how far a company can invalidate its own contracts on the ground that they are *ultra vires*, was discussed at great length in the House of Lords in the case of *Railway Co. vs. Hawkes*, 35 E. L. & Eq., 8.   A corporation has no power except what is given by its incorporating act, either expressly, or as incidental to its existence.   *Dartmouth College vs. Woodward*, 4 Wheat., 636; *Betts vs. Menard*, 1 Breese; Appx., 14; *State vs. Stebbins*, 1 Stew., 299; *Beatty vs. Knowler*, 4 Pet., 152; *People vs. Utica Ins. Co.*, 15 John, 538; id., 675; 9 Paige 470.

A contract made with a corporation for the loan of money, as well as the security taken on the loan, is void, if the power to loan money be not expressly given, or necessarily incident to the powers given to the corporation by its charter."   *Beach vs. Fulton Bank*, 3 Wend., 573.

The one hundred bonds of $1000 each, called by way of designation municipal bonds, issued for the purpose of sale in the market, were void, as being issued, not only without

authority of law, but against such authority. Municipal corporations, even at common law, had no power to create a debt for any other purpose than that within the legitimate scope and object of the corporation.

Section 3 of Article 9 of the Constitution of this state, is used as an argument in favor of the general power of cities and villages to borrow money and contract debts, except as restrained and restricted by some positive law. This is indeed a perversion of the meaning and intent of that article, which would utterly astonish the framers of that instrument. It was intended as a wholesome guard upon the legislature in conferring these powers upon such cities and villages as they might be called upon to incorporate, and now they find the very act by which their prudence and caution was manifested, used as an argument to give a latitude and license to these corporations, which it was never dreamed before that they possessed. But to create a debt is one thing, and to issue bonds, or evidences of debt, where in fact no debt exists, or has been created, and hawk them about among the brokers and shaving shops of Wall street, is another and very different thing. It is pretended, and it is a mere pretence, not true in fact, that the money realized on the sale of these bonds was expended for general city purposes. But if this were true, it would not legalize the issue of these bonds. If the bonds were illegally issued, no subsequent act or ratification, or proper or improper use of the money, would make them legal. In the provision of the charter of the city which empowers the common council to levy a tax for the payment of all the legitimate expenditures of the city government, complete and ample provision is made to meet all the indebtedness which can properly be incurred. Then the issue of these bonds was not only unauthorized but unnecessary, and in every view, impolitic and mischievous. City Charter, ch. 7, § 5.

There must be express authority to authorize a municipal corporation to borrow money, even for legitimate purposes, much more to issue paper, whether bonds, notes, or other obligations, for the sole purpose of selling them in market. The power to levy taxes is one of the highest attributes of sovereignty, and in favor of an inferior body or corporation, will never be presumed or implied.

Section 3 of chap. 7, of the city charter, declares that "no money shall be appropriated for any purpose whatever, ex-

cept such as is expressly authorized by this act." This is a full and complete answer to the assumption that the common council had an implied or general power to raise and appropriate money, and was doubtless inserted in the charter for the very purpose of preventing abuses in the appropriation of money under the cover of implied authority. A municipal corporation possesses no power to levy taxes not expressly authorized by its act of incorporation." Bl. Tax Titles, 197, and cases there cited.

To allow the common council to fill up the treasury *ad libitum*, with money raised by the issue of bonds, would place it in their power to use the money thus obtained for purposes not warranted by the charter, and yet the city be forced to submit to the wrong; for what difference would it make whether they were compelled to pay the bond on which the money was raised, or to pay by tax directly for the illegal appropriation. It is most palpably permitting the common council to do that indirectly which it cannot do directly. Grant that the common council had the power to raise money in this way for certain specific and legitimate purposes—that purpose ought to appear distinctly in the transaction, so that the parties dealing with the city might know that its power was not transcended, and that the expenditure of the money, when obtained, might be restrained to the particular purpose or purposes for which it was raised. The tax which the common council undertook to levy, being illegal and void as to the items of interest on these bonds, the plaintiff had the right to restrain the sale of his lots for the same, although there might have been items of that tax which were perfectly legal and properly levied and assessed. Blackw., Tax Titles, 192, and cases there cited.

But there are other fatal objections to the tax in question. In the first place the assessors did not meet for the purpose of hearing objections, &c., as required in sec. 7 of chap. 7 of the city charter. Blackw. Tax Titles, 135. Alterations, in the aggregate, to about fifty thousand dollars, were made in the assessment roll, by some person or persons wholly unauthorized, after the same had been returned by the assessors. The tax list upon which the taxes were made out, did not correspond with the assessment roll returned by the assessors, by a very large amount in a large number of important particulars. The tax was not levied by a vote of two-thirds of the common council as required by section 9 of chap. 7 of the city

Mills vs. Gleason.

charter. The common council of said city, chap 4, sec. 1, is composed of twelve aldermen and one mayor, making thirteen in all. Eight, the number of affirmative votes on the question of levying this tax, is not two-thirds of thirteen. Besides, the vote on which the only reliance is placed, was itself an illegal vote. By reference to the case it will be seen that a resolution was offered in the common council, levying a tax of six per cent. upon the assessment roll, as returned by the assessors. Upon that resolution, when put upon its passage, the vote was five in the affirmative and four in the negative. It will be seen that that vote was reconsidered, and the resolution was again put upon its passage, and lost by the same vote, and afterward another reconsideration was had—which resulted in the vote of 8 to 1—but which vote, it is submitted, is illegal, the resolution have been previously twice rejected at the same meeting. Cushing's Law and Practice of Legislative Assemblies, § 1273.

The "cemetery bonds" were unlawfully issued, for the reasons, first, that there was no valid ordinance, or resolution authorizing the same, and because they were issued in direct violation of law. Local Laws of A. D., 1857, 140.

The return of the tax list to the county treasurer was illegal, having been made after the official character of the city treasurer had expired, and after the day fixed by law for the same. Private laws of 1858, chap. 42, § 8. Blackw. Tax Titles, 144; 2 Hen. & Mumf., 318, 344; 17 Cowen 550.

The city charter was not in force, not having been published at the time of issuing the municipal bonds. The act was not legally published until Dec. 3, 1856. Local Laws, A. D., 1856, 1223.

The treasurer has not a general power to sell land for the non-payment of taxes; it is a special power to sell in particular cases, or when a particular state of things exist, prescribed by statute. Wherefore, it is held that those particular cases must exist, or else the power does not arise, and their existence must definitely and affirmatively appear. Blackw. Tax Titles, 57.

*By the Court,* PAINE, J. In the case of *Clark vs. The City of Janesville,* the majority of the court held that the charter of that city was a public, and therefore a general law, with-

in the meaning of the constitutional provision, that no general law should be in force till published.

The charter of the city of Madison was not published until after the issue of the bonds, whose validity is questioned in this suit, and the case would, therefore, be governed by that decision, unless, as is claimed on the other side, the city, after it did acquire an existence as such, by the publication of the charter, did some act ratifying the issue of the bonds, so as to bind itself. This ground of objection is one of a technical character, and although it must prevail where the case comes within it, yet a stronger case could not well be presented, for applying the doctrine that a subsequent ratification will render valid, acts that in point of strict law were unauthorized when they were done. This is a familiar rule in the case of individuals. If a man without any authority assumes to act as the agent of another, although the act, as to the other is of no validity, yet if he subsequently ratifies it, and adopts it, and receives the benefit of it, he is as much bound as though he had authorized it in the first instance. And we think this principle applicable to this case. Here every thing was done necessary to authorize the issuing of the bonds, except the publication of the charter, all the parties, however, supposing it to be in force. If, after it was in force, the city received the proceeds, and appropriated them to its use, and recognized the validity of these bonds, we could not well imagine a case more fit for the application of this rule. And we think the following authorities fully justify its application: *Charitable Society vs. Episcopal Church in Dedham,* 1 Pick., 372; *Edwards vs. The Grand Junction Railway Co.,* 7 Sim., 85, *Goodey vs. Railway Company,* 16 E. L. and Eq., 596. In the last case the Master of the Rolls, referring to the previous cases, says that they " establish the principle that whenever a third party enters into a contract, with the plaintiff, and the defendant takes the benefit of it, he is bound to

give the plaintiff the advantage he has contracted for." Upon looking into the cases it will be seen that the rule was established upon these facts. The projectors of a railway company had made contracts prior to its organization, which the company when organized received the benefit of; and it was held that they thereby became bound by the contract. The facts in this case are similar in character, or, if any thing, stronger in favor of the rule, for here the parties all acted in the full belief that the charter was in force.

It appears from the evidence that the proceeds of the bonds went into the treasury of the city, and were expended by it, and that after the charter was in force, their validity was recognized by levying a tax for the payment of the interest. We think this ratifies them, and binds the city, provided it would have been bound, if the charter had been in force at the time they were issued.

But it is claimed that the city had no power to make this loan, or issue its bonds therefor. There is no special act and no provision in its charter expressly authorizing it, and it was said that without this, the power to borrow money did not exist, and could not be claimed as incidental to the execution of the general powers granted by the charter. The charter does confer the power to purchase fire apparatus, cemetery grounds, etc., to establish markets, and to do many other things, for the execution of which, money would be necessary as a means. It would seem, therefore, that in the absence of any restriction, the power to borrow money would pass as an incident to the execution of these general powers, according to the well settled rule that corporations may resort to the usual and convenient means of executing the powers granted; for certanly no means is more usual for the execution of such objects, than that of borrowing money. But an argument against the right is derived from the practice which has prevailed to a considerable extent, of obtaining special

acts of the legislature, authorizing the procurement of loans by municipal corporations, and the issuing of bonds or other securities in payment.

We are not aware to what extent, if any, this practice has prevailed in this state, as to loans for purposes clearly municipal, and authorized by the charter; but it seems to have been resorted to sometimes, even in such cases, in other states. The argument drawn from the assumption on the part of the legislature of the necessity of such acts, is one always entitled to consideration, and sometimes of much weight, though never conclusive; and we think, owing to the peculiar nature of the subject matter, that in cases involving a loan by corporations, it is of less force than in almost any other, for capital is of a timid jealous disposition. It delights in certainty, and is alarmed by doubts. It has been held with great strictness, that corporations can exercise no powers except those granted by their charter. When, therefore, the charter does not expressly give the power of borrowing money, even though it grants powers to which this might be claimed as incident, yet there is room for doubt, a chance for an argument, and that being so, it might, as a matter of policy, facilitate the loan by removing all uncertainty by an express act of the legislature. And the fact that such acts have been passed, being then clearly necessary, when these corporations have been authorized to issue bonds in aid of purposes outside of their charters, may have had a tendency to induce a resort to the same practice when the bonds were issued for some purpose authorized by the charter, though in that case such legislation may not have been necessary. For these reasons we think there is nothing in this practice sufficient to overthrow the general rule, that in the absence of restrictions, a corporation authorized to contract debts and to execute undertakings requiring money, may borrow money

for those purposes, and issue its bonds or other obligations therefor.

This question is alluded to in *Ketchum vs. the city of Buffalo,* 4th Kern., 356, and the court held that the fact that in several other instances, the legislature had expressly granted power to corporations to " purchase market lots," did not justify the conclusion that the city of Buffalo could not exercise the power as incidental to the general power of establishing a market. The court held that under that general power, it mighi purchase the lot on credit, and issue its bonds in payment. And, after carefully considering the suggestions made by the learned judge who delivered the opinion, we fail to perceive any substantial distinction, so far as the question of power is concerned, between the method there adopted and that adopted by the city of Madison in this case. True, it is there suggested that the question whether the city of Buffalo could have borrowed the money and paid for the lot, and issued its bond for the money, was a different question, though at first view " they might seem identical." But on examining the points of distinction stated, we think they do not affect the question of power, but simply go to show that the one method of exercising it may afford less facility for a misapplication of the funds than the other. Thus it was said that if the money was borrowed to build a market, it might be used to build a theatre, whereas if the contract were directly for the market, and the bond given in payment, it would ensure the application of the fund to its legitimate object. This might be a good reason why the legislature should restrict the corporation to the one method of accomplishing the object ; but when the power is granted without restriction as to the means, it does not, in our opinion, justify a court in saying that while the corporation has the power of using one means, it has not that of using another, though equally direct and well adapted to the accomplishment of the object,

provided the funds are honestly applied; merely because it may afford greater facility for a misapplication. They might undoubtedly be misapplied in either case. Thus, what should prevent the city of Buffalo, having purchased a lot for a market, and given its bonds for it, from erecting a theatre instead of a market on the lot, if it was to be assumed that it was willing to pervert its funds and its credit to unauthorized purposes? Or, having purchased materials for a market, it might out of them erect a theatre. Or, having given its bond for the purchase of a lot, and the erection of a market, and then having raised by taxation the money to pay the bond, it might use the money to build the theatre, leaving the bond unpaid. This opportunity of misapplying the funds must exist under any method of executing the powers of a corporation. If one affords greater facility for it than another, the remedy is in restrictions by the legislature, and the selections of honest and capable agents by the people. But it affords no ground for a court to say that as a mere question of power, the corporation may not adopt the one method as well as the other; and it being established that a corporation may purchase upon credit such things as are necessary for the execution of its powers, we think it follows necessarily that it may borrow the money to pay for them, as that is one mode of purchasing upon credit.

Nor is the power of taxation conferred by the charter to be deemed to exclude the power of borrowing money. The case just referred to is an authority against such a proposition. It holds that, notwithstanding the power of taxation, the corporation may resort to its credit, not only for its ordinary current expenses, but for objects of a permanent character. The case of *Clark vs. School District*, 3 R. I., 199, is also in point. It was there held that a school district might borrow money to pay debts contracted for the erection of a school-house, and give its note therefor, and that its power of taxation was

not to be construed as forbidding it to borrow money for a legitimate purpose. *Beers vs. Phœnix Glass Co.*, 14 Barb., 358, and *Mead vs. Keeler*, 24 Barb., 29, are also direct authorities in favor of the power of a corporation to borrow money, as incidental to the execution of its other powers. It was said on the argument, that it did not appear that the moneys received were all applied to municipal purposes. It does not appear how they were all applied, but we apprehend it would not be incumbent on the lender to show that they were properly applied. If the city had power to borrow money for legitimate purposes, a misapplication of the funds after they were obtained would not invalidate the contract. In *Bigelow vs. the City of Perth Amboy*, Dutch., 297, the city had purchased a quantity of flag-stone, for paving streets, and it was claimed that the charter had not been complied with, in respect to the proceedings preliminary to the paving by the city. But the court held that to be a question between the city and the lot owners, and they add : " But as between the creditors of the city and the corporation, the only question is whether the city agents, the mayor and council, had the power of purchasing the material in question. How the material was used, or whether it was used at all, is to creditor a matter of total indifference." So in a recent case in England, *Eastern Counties R. R. Co. vs. Hawkes*, 38 E. L. & E., 8, it was held that where the charter allowed the company to purchase lands for extraordinary purposes, a person contracting to sell them land was not bound to see that it was strictly required for such purposes, and that if he acted in good faith, without knowing of any intention to misapply the funds of the company, he might enforce the contract.

The principle of that decision would seem to warrant the proposition, that where a corporation has power to borrow myney, a lender, acting in good faith, and supposing it to be

borrowed for legitimate purposes, might recover, even though the corporation intended to devote it to objects unauthorized. And it would certainly sustain the position, that where it was borrowed for lawful objects, no subsequent misapplication of the funds could affect the rights of the lender, about which there is, in fact, no room even for the shadow of a doubt.

But it was objected that the tax was not levied by a two-thirds vote, as the charter requires. It was levied by a two-thirds vote of the aldermen, but not of the council, including the mayor. The charter provides that the " Common Council shall consist of the mayor and aldermen, &c. It provides that a vote to levy a tax shall be passed by two-thirds of the " members elect," and it is said that the mayor should be counted in making up the number, of which the two-thirds is requisite. But we think this provision relates to the aldermen only. They are elected as members of the council, and as nothing else ; they act and vote on all questions ; while the mayor, although he is made by the charter one of the constituent parts of the council, yet he is so in the same sense that the Vice.President is a part of the United States Senate, or the Lieutenant Governor a part of the Senate of the State. We think he was not intended to be counted, in the provision for a two-thirds vote.

It is also objected that the assessors did not meet for the purpose of hearing objections, as required by the charter. We are unable to say from the evidence that this objection is true in point of fact. It appears from the evidence on both sides that the assessors did meet, and the most that can be said is, that it does not appear that they were all present at any one time. We shall not attempt to determine what would be the effect of an entire omission of this meeting by the assessors. It is undoubtedly a matter of much difficulty both upon principle and upon authority, to determine with what degree of strictness the directions of the statute in re-

gard to taxation must be followed, in order to prevent the entire tax from being illegal. On the one hand it is the evil of illegal and oppressive taxation upon the citizen; and on the other, the danger of defeating entirely the collection of the public revenue, by the neglect or omissions of the officers to whom it is entrusted. Perhaps the only method of solving the difficulty would be to hold that no objection which did not go to the very ground work of the tax, so as to affect materially its principle, and show it must necessarily be illegal, ought to have the effect of rendering the whole invalid; and there are some authorities, which even hold that such an objection would not; though in the case of *Weeks vs. Milwaukee*, 10 Wis., 240, this court gave it that effect. But when the objection is a mere non-compliance with some direction of the statute, notwithstanding which the tax may have been entirely just or equal, it ought not to have that effect. If it did, the collection of taxes would be rendered practically impossible. In such cases the remedy must be for each one to obtain such special relief as the laws may furnish on showing the omission, and that he was aggrieved by it.

And this disposes of the objection now under consideration, and also of the one that the tax list was not returned to the county treasurer within the time required by law. Neither of them necessarily impeach the justice of the tax, and there is nothing in the case to show that the complainant was especially aggrieved by either. And we do not think he can sustain a suit in equity to enjoin the collection of a tax legal and just in itself, merely on account of such irregularities.

We will notice but one other objection, which might properly have been noticed before. It is said that the cemetery bonds were issued in violation of law. And it appears that by sec. 3, chap. 104, Private and Local Laws of 1857, the city was prohibited from issuing, selling or disposing of any bonds, except those specially authorized for the enlargement

of the capitol. It might be here noticed that this statute turns the argument to be derived from the understanding of the legislature, in favor of the existence of the power previously. For passing the act to prohibit it, implies that without such act the city had the power. The same thing is necessarily implied in that provision of the constitution which requires the legislature to " restrict" the power of municipal corporations " to contract debts, borrow money, loan their credit," &c. But the answer to this objection, that this act made the issuing of the cemetery bonds illegal, is this: It appears from the case that the city had previously purchased the lot and contracted for that mode of payment. The act of the legislature then could not impair the obligation of that contract, or defeat the party's right to its specific performance.

The judgment of the county court must be reversed and the cause remanded, with directions that the complaint be dismissed.