## Case No. 5,276.

### GAUSE v. CLARKSVILLE.

[5 Dill. 165; 19 Alb. Law J. 253; 18 Am. Law Reg. (N. S.) 497; 8 Cent. Law J. 358; 7 Reporter, 519; 4 Cin. Law Bul. 585.] [1]

Circuit Court, E. D. Missouri. March, 1879.

MUNICIPAL CORPORATIONS — POWER TO BORROW MONEY—POWER TO ISSUE COMMERCIAL PAPER.

1. Whether a municipal corporation possesses the power to borrow money, and to issue negotiable securities therefor, depends upon a true construction of its charter and the legislation of the state applicable to it.

[Cited in Merrill v. Monticello, 138 U. S. 682, 11 Sup. Ct. 445; Francis v. Howard Co., 50 Fed. 56.]

[Cited in Bogart v. Lamotte Tp., 79 Mich. 298, 44 N. W. 613.]

2. It has no incidental or inherent authority under the usual grants of municipal powers as a means of discharging its ordinary municipal functions. Such authority may be inferred from special and extraordinary powers, which require the expenditure of unusual sums of money, when it is usual to execute such powers by means of borrowing, and when, upon the whole legislation applicable to the municipality, such appears to have been the legislative intent.

3. These principles applied, and coupon bonds to borrow money to erect and repair wharves and to open streets, issued under the general grants of municipal power in the charter, were *held* not to be binding upon the city, while other bonds, issued under a special act of the legislature, in payment of stock in companies organized to construct macadamized roads from the city, were *held* to be valid.

[Cited in Dorian v. City of Shreveport, 28 Fed. 295; Morton v. City of Nevada, 41 Fed. 588; Deland v. Platte Co., 54 Fed. 834.]

[Cited in Miller v. Board of Com'rs of Dearborn Co., 66 Ind. 168.]

4. Where bonds of a city are issued without authority for money borrowed and actually received by the city, the remedy against the city is not by an action on the bonds, but to recover the money.

[Cited in Green v. Dyersburg, Case No. 5,756. Approved in Erwin v. St. Joseph Board of Public Schools, 12 Fed. 684.]

On demurrer to counts 1 to 10 and 12 to 17 of the amended petition. All of the counts in the petition state, for causes of action, the making by defendant of divers ne-

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 7 Reporter, 519, contains only a partial report.]

gotiable bonds, payable to bearer, and all acquired by plaintiff [William R. Gause] after maturity. All of them allege the defendant to be a corporation, incorporated (1) June 7th, 1847, under the general law of 1845 as to the incorporation of towns (Rev. St. 1845, p. 552), and (2) on February 24th, 1853, under a special act, approved that day, entitled, "An act to incorporate the town of Clarksville" (Acts 1853, p. 591). Counts 1 and 2 allege that the bonds therein named were made "for money borrowed by defendant for the purpose of erecting and repairing wharves in the corporate limits of its city, and for otherwise improving said city." Said bonds are respectively for $2,000 and $1,000—together $3,000. Counts 3 to 10 allege that the bonds named in them were made "for money borrowed by defendant for the purpose of opening, clearing, graduating, paving, and improving divers streets and alleys in said city, and of otherwise improving said city." Said bonds are respectively for $1,000, $1,000, $1,500, $400, $400, $200, $1,000, and $500—total $6,000. The bond named in count 1 reads thus: "$2,000. Wharf Improvement Bond. No. 1. City of Clarksville, Mo., Sept. 1st. 1864. Ten years after date the city of Clarksville, in the state of Missouri, promises to pay to William C. Prewitt, or bearer, at the treasury of said city of Clarksville, the sum of two thousand dollars, with interest at eight per cent per annum, payable annually on the first day of September in each year, upon the presentation of the coupon hereunto annexed, until the said principal sum is fully paid, without defalcation, for value received. In testimony whereof, in pursuance of ordinance No. 106 of said city, I, E. B. Carroll, mayor of said city, have hereto set my hand and caused the corporate seal of said city to be affixed, and the clerk of the city council to attest the same, at the city aforesaid, this first day of September, A. D. 1864. (Seal.) E. B. Carroll, Mayor. Attest: J. A. Manns, Clerk City Council. Countersigned: John M. Clifford, City Treasurer." The bonds named in counts 2 and 10 are substantially the same in form as this, except as to caption, dates, names, and amounts, and are headed "Street Improvement Bonds." All of the counts allege payment by defendant of interest on the bonds during all the time they were running, and until after maturity—that is, for from six to twelve years. While they do not allege anything as to the use made by the city of the money borrowed on them, yet the counsel for the plaintiff states the fact to be that it was in each instance used for the purposes for which it is alleged to have been borrowed, and plaintiff—if it be deemed by the court to be material to his cause of action—will, with leave, so state the facts by amendment. He contended, however, that no such averment is necessary.

The sole question raised by the demurrer

to these counts is whether defendant had power to borrow money for the purposes alleged, and to give the bonds in suit for such money. The provisions of the charter in respect of these bonds sufficiently appear in the opinion of the court. The defendant's population is stated to be between one and two thousand. As to counts 12 to 17, on "Road Improvement Bonds:" The allegations of these counts show that the bonds declared on therein were given for money borrowed to pay other bonds previously given in payment of subscriptions made by defendant to stock in certain companies organized to build gravel roads from Clarksville to other points in Missouri. The bonds, in form, are substantially the same as those named in counts 1 to 10, except as to names of the payees, dates, and amounts. The interest is alleged to have been paid on them during the whole time they ran, and until after maturity.

The act which is alleged as the authority for the subscriptions by defendant to the stock of said road companies and the issue of bonds is found in Sess. Acts 1857, p. 302, and reads thus:

"Sec. 1. The city council are hereby authorized and empowered to levy, assess, and collect a direct tax on all real estate within the city limits, not to exceed two per cent per annum, for the purpose of aiding in the construction of macadamized or other roads leading from Clarksville to any other point in the state; and, for the purpose of securing the building of such roads, they may cause subscriptions of stock to be made by the city to any company now organized, or which may hereafter be organized, to construct such roads.

"Sec. 2. All dividends that may be declared to the city of Clarksville by any such company, upon stock paid in from the special tax authorized by the 1st section of this act, shall be by the city council paid over to the real estate owners paying the tax, in proportion to the amount of tax respectively paid by them."

The question raised by the demurrer to these counts is whether the city had the power, under this act, to issue bonds in payment of stock subscribed by it, and, when they became due, to issue other bonds for money borrowed to pay them.

Dryden & Dryden and Enoch Pepper, for plaintiff.

Wagner, Dyer & Emmons, for defendant.

[Before DILLON, Circuit Judge and TREAT, District Judge.]

DILLON, Circuit Judge. We are of opinion that the act of 1845 (Rev. St. 1845, p. 552) was superseded by the special act of February 24, 1853 (Acts 1853, p. 591), incorporating the defendant city.

Three classes of bonds are in question, headed and styled respectively, "Wharf Im-

provement Bonds," "Street Improvement Bonds," and "Road Improvement Bonds." The first two stand on the same, the last on a different ground. The former will be first considered. The bonds purport to be unconditional obligations of the city, and are negotiable in form. They do not recite the purpose for which they were issued; this purpose only appears, if at all, from the heading.

The charter of the city (section 13) gives the city council power "to erect, repair, and regulate wharves," and "to open, clear, regulate, graduate, or improve the streets of the city." Section 1 creates the city a corporation, and provides that it shall have power to contract and to sue and be sued, etc., and "may grant, lease, purchase, receive, and hold property, real, personal, and mixed, and may do all other acts as natural persons; and may have a common seal, and alter and break the same at pleasure."

Section 12 gives to the council general power to levy taxes on property in the city, but limits such taxes to a rate of one-fourth of one per cent.

As to the "Wharf Improvement Bonds," the petition alleges that they were made for "money borrowed by defendant for the purpose of erecting and repairing wharves in the corporate limits of its city, and for otherwise improving said city." These bonds are respectively for $2,000 and $1,000—together $3,000.

As to the "Street Improvement Bonds," it is alleged in the petition that they were executed "for money borrowed by the defendant for the purpose of opening, clearing, graduating, paving, and improving divers streets and alleys in said city, and of otherwise improving said city." These bonds are respectively for $1,000, $1,000, $1,500, $400, $400, $200, $1,000, and $500—total, $6,000.

The demurrer to the petition upon the foregoing classes of bonds is upon the ground that the defendant had no power to borrow money for the purposes alleged, or to execute the bonds.

The questions to be decided are, therefore, two: 1st. Had the city power to borrow money for the purposes alleged? 2d. If so, whether it had the power to execute negotiable bonds therefor.

The charter contains no express power to do either, unless it is conferred by the clause in section 1 above quoted, that the city "may do all other acts as natural persons." This general language must necessarily be restrained to such other acts as are authorized by its charter or the statutes of the state applicable to the city, if any, and cannot be construed to remove all the limitations inseparable from corporate existence, and to confer upon the city authority to engage in business of a private nature, or to make its powers commensurate with those of natural persons. It is not, therefore, an express power to borrow money or to issue commercial paper. No such powers are in terms con-

ferred. If they exist, they exist as incidental to the express powers to erect and repair wharves, and to open and improve streets, and not otherwise.

As the power to borrow money and the power to issue negotiable paper are, though closely related, not identical, they will be to some extent separately considered. And, first, as to the power to borrow money: As the case stands, it is to be taken that the money evidenced by the bonds now under consideration was borrowed in advance of any debt incurred in respect of the wharves or streets, and as a means of raising by their sale in the market a fund to pay for contemplated improvements of that character.

The general question as to the implied power of municipal corporations to borrow money and to execute negotiable securities therefor has been recently much examined. The American cases on the subject are conflicting, and it is impossible to harmonize them. A careful examination of them, however, has left us with the conviction that the questions here involved are not only open to discussion, but remain yet to be judicially settled. The unsettled state of the law, concurring with the great importance of the question, has induced us to examine it with care, and must be our justification for discussing the subject with more than ordinary fulness.

The following cases favor the existence of the incidental powers here in question: Bank of Chillicothe v. Town of Chillicothe (1836) 7 Ohio, pt. 2, p. 31; Mills v. Gleason, 11 Wis. 470; Williamsport v. Com., 84 Pa. St. 487 (three judges dissenting); Clarke v. School-Dist., 3 R. I. 199; Sheffield Tp. v. Andress, 56 Ind. 157. And see cases collected in notes to sections 82 and 407, Dill. Mun. Corp.

The following cases are opposed to the existence of such powers: Hackettstown v. Swackhamer, 37 N. J. Law, 191; Knapp v. Hoboken, 38 N. J. Law, 371; Beaman v. Leake Co. (power of counties) 42 Miss. 237; Police Jury v. Britton (power of counties) 15 Wall. [82 U. S.] 566, 572; opinion of Bradley, J., in Nashville v. Ray, 19 Wall. [86 U. S.] 468.

It is not proposed to examine and review these cases separately. In the existing uncertainty of the law on the subject, it is better, perhaps, to discuss the questions upon principle, rather than to place our judgment respecting them upon one class of the conflicting decisions.

Corporations in this country can exist only by virtue of legislative enactment, and it necessarily follows that whether they possess the power to borrow money or to make negotiable paper depends upon a true construction of their charters and the legislation applicable to them. This is true of all corporations, private as well as municipal.

An examination of the judicial judgments in England and in this country shows considerable diversity of opinion between the Eng-

lish and American courts as to the extent of the implied powers of corporations. The English courts have at all times wisely set a strong face against an elastic construction of corporate charters. The American courts have too often favored the existence of constructive powers.

In England, if a private corporation wishes power to borrow money, the power and the purposes for which, and the conditions on which, it may be exercised, are expressed in the charter of constituent acts, or in the memorandum and articles of association; and the power is not held to exist unless the charter or articles of association confer it, or unless the nature of the business for which the corporation is chartered or organized raises a necessary or reasonable implication of its existence.

But in this country it must be admitted that the courts have held, quite without exception, that all corporations for pecuniary profit, unless specially restrained, may not only borrow money, but issue negotiable paper for any corporate debt. Dill. Mun. Corp., §§ 82, 407, and cases cited in notes; Lucas v. Pitney, 3 Dutch. [27 N. J. Law] 221; Hackettstown v. Swackhamer, 37 N. J. Law, 191, per Beasley, C. J.

The original of our municipal institutions are derived from England, and it is the unquestionable law of that country that municipal corporations have no power to borrow money unless conferred by statute. Regina v. Lichfield, 4 Adol. & E. (N. S.) 891, 906. In the case just cited it was held that there could be no recovery upon the note of the corporation given for money borrowed and used to pay the debts of the corporation. Patteson, J., without saying that the lender was absolutely remediless in any form of action or suit, did say that he had no remedy upon the note, because this is "not a trading corporation."

In this country municipal corporations are by statute invested with certain defined powers, and they are almost wholly dependent upon revenues derived from the authority given to levy taxes for the means of executing their municipal functions.

In the case before us the defendant city had, inter alia, the usual power to erect and repair wharves and to improve streets, and to make contracts and to incur debts therefor. It had the power to levy taxes to raise the means to pay debts thus created. The amount of taxes authorized to be laid in any one year was limited. It is entirely practicable for the city to execute its ordinary municipal powers, and discharge its ordinary municipal duties, without resorting to borrowing money. If, in erecting wharves or improving streets, it incurs a general debt, it seems to us plainly to have been the intention of the legislature, as shown by the charter, that it should be paid out of its ordinary revenue. It is not necessary to resort to the perilous expedient of borrowing money in advance, which may be lost,

embezzled, or misappropriated; much less to borrow it on a long credit, which inevitably leads to abuse and extravagance, and issue therefor, as the means of obtaining it, its negotiable securities. There is an obvious and essential difference in incurring a debt to be paid in the usual manner, out of the ordinary revenues of the corporation derived from taxation, and the raising of money in advance by a pledge of credit and the issue of coupon bonds, payable at a long-distant day, for sale in the money markets of the country.

What are the consequences of holding that there is, under these circumstances, an implied power to borrow money in this manner and for this purpose? The temptation to extravagance and the danger of loss have been already mentioned, and the history of the workings of our municipal institutions shows that this temptation always operates to their injury, and that burdensome debts and oppressive taxation are its natural and almost inevitable results. But this is not all. Legal consequences of a serious nature follow from the doctrine that there is an incidental power to borrow money to execute the ordinary powers of the municipality. If the power thus to borrow exists, it is without legal limits. Its only possible limit is the credit of the corporation—the amount of bonds its officers can sell. Nor is this all. If the power to borrow money exists, then, under the view of the courts as almost universally held in this country, the power to borrow implies the further power to give, like any other borrower, a note, bill, or bond, negotiable in form and effect, for the sum borrowed; the time of payment and the discount to be such as may be agreed upon between the corporation and the proposed lender. The bonds may, as in the recent case of the city of Williamsport, be issued for an enormous amount, and be sold, as in that instance, for sixty-seven per cent. of their par value, or even less, and the corporation is bound. Williamsport v. Com., 84 Pa. St. 487. Nor is this all. The supreme court of the United States has firmly established the doctrine, by a long series of well-known decisions upon municipal bonds, "that when a corporation has power, under any circumstances, to issue negotiable securities, the bona fide holder has the right to presume that they were issued under the circumstances which gave the requisite authority, and they are no more to be impeached in the hands of such a holder than any other commercial paper." Lexington v. Butler, 14 Wall. [81 U. S.] 282.

Such are the mischievous and alarming consequences of the unsound doctrine that a municipality has, by virtue of its ordinary powers, and merely as a means of executing its ordinary duties, the power to pledge its credit by the issue and sale of its commercial obligations. It is not the law. No such doctrine can permanently stand. Although it has taken as yet no deep root in our jurisprudence, it has nevertheless attained suffi-

cient development to show its noxious character. The general, and, until a period comparatively recent, the universal, practice of municipalities not to issue, without express legislative authority, bonds or commercial obligations as a means of raising loans, demonstrates the non-existence of an implied power to do this by demonstrating that no such power is necessary to enable a municipality to execute its usual powers and to discharge its ordinary duties.

We are required in this case only to determine the inherent or incidental power of the city to raise loans by a sale of its negotiable securities, payable at a distant day. We deny any such power. Whether all borrowing to meet debts actually incurred under an arrangement which contemplates repayment out of the regular revenue, and for which a mere voucher or certificate of indebtedness is issued, is ultra vires unless the authority is expressly given, we need not now decide. What we decide on this point is that the power to erect wharves and to improve streets, conferred by the defendant's charter, does not carry with it the power to raise funds for this purpose by the issue and sale of negotiable securities like those here in suit.

Whatever doubt may be considered to exist as to the implied right to borrow, the want of authority in a municipal corporation, as merely incidental to its usual municipal powers, to issue negotiable securities which shall be invested with all the attributes of commercial paper, seems, on reason and principle, to be plain. Commercial paper had its origin in the conveniences or necessities of trade among merchants. Originally only merchants made such paper; afterwards the making ·of it was extended to all persons acting in their individual capacity. It extends to trading, commercial, and other partnerships; but if the partnership is not a trading partnership, "the question," says Mr. Lindley, "whether one partner has implied authority to bind his copartners by putting the name of the firm to a negotiable instrument depends upon whether the business of the partnership is such that dealings in negotiable instruments are necessary for its transaction, or are usual in partnerships of the same description." 1 Lindl. Partn. (Eng. Ed.) 213, 214.

As to the power of corporations to issue commercial paper, the law of England is settled. In England no corporation, whether municipal (Regina v. Lichfield, 4 Adol. & E. (N. S.) 891, 906) or private (Bateman v. Mid-Wales Ry. Co., L. R. 1 C. P. 499, A. D. 1866), has the incidental right to make commercial paper, except the Bank of England, which was incorporated for the very purpose, and trading corporations strictly, such as the East India Company. We state the foregoing propositions after a careful examination of the English books. Accordingly it is laid down by Mr. Justice Byles, in his work on Bills, that, "without special authority, expressed or implied, a corporation has no power to make, endorse, or accept bills or notes." Byles, Bills (8th Eng. Ed.) 62. Thus, a waterworks company (Broughton v. Manchester & S. Water-Works, 3 Barn. & Ald. 1), a gas joint stock company (Bramah v. Roberts, 3 Bing. N. C. 963), or even trading companies, unless such a power is essential to the purposes for which they are formed (Bateman v. Mid-Wales Ry. Co., supra), have no general or implied authority to make commercial paper. In Bateman's Case (just cited), the question for the first time arose in England, as late as 1866, as to the right of a railway company, with an authorized capital of £170,000, to make or accept bills of exchange, and it was unanimously decided, by judges of great eminence (Erle, C. J., Byles, Keating, and Montague Smith, JJ.), that the company had no such power. The acceptance was under seal, and it is a mistake to suppose that the decision rested on the technical ground that a corporation can only contract under seal. It was placed upon the broad ground that there was no act of parliament, general or special, which conferred the power. It was admitted by all the judges that the railway company might incur debts in the construction or operation of the road; "but it is one thing," says Keating, J., "to say that they shall be liable to be sued for goods sold and delivered or for work done, and an entirely different thing to say that they may accept bills in payment." And to the same effect was the opinion of the other judges.

The principle of this case was approved in the Peruvian Ry. Co. v. Thames & M. Marine Ins. Co., 2 Ch. App. 617, when a general incidental power to issue bills of exchange and negotiable instruments under the companies act of 1862 was denied, and the power held to depend upon the proper construction of the memorandum and articles of association. The companies organized under that act may communicate this power to their directors, but it must be given expressly or by fair intendment in the memorandum and articles of association of the company, or it will not exist.

We are aware that the American courts, as to private corporations organized for pecuniary profit, have very generally held a different doctrine, and affirmed their implied or incidental power to make commercial paper. Dill. Mun. Corp. §§ 81, 82, 407, and cases cited. But· the powers of private corporations in this regard are not here material.

The American judgments which have affirmed the like power in municipal corporations have done so upon this course of reasoning: The corporation, they argue, has power to contract a debt, and it is assumed to be incident to that power to give a note or bill or bond in payment of it. Thus, in Kelley v. Mayor, etc., of Brooklyn, 4 Hill, 263, Cowen, J., makes the basis of the judg-

ment the erroneous proposition that, independent of any statute provision, all corporations, private and municipal, may issue negotiable paper for a debt contracted in the course of its business; and other courts have, without examination, adopted this mistaken view of the law. City of Galena v. Corinth, 48 Ill. 423; Clarke v. School-Dist., 3 R. I. 199; Sheffield Tp. v. Andress, 56 Ind. 157; Tucker v. Raleigh, 75 N. C. 267; Ketchum v. Buffalo, 14 N. Y. 356; Douglass v. Virginia City, 5 Nev. 147; Sturtevants v. Alton [Case No. 13,580].

It sufficiently appears from the foregoing that it is a mistake to affirm that the power to issue negotiable paper necessarily or legally results from the corporate power to create debts.

In England, as shown by Bateman's Case, supra, it is held that, inasmuch as the corporation has no power to accept bills, it cannot be made liable on its acceptance, though the bill was drawn for a valid and binding debt.

On this point Erle, C. J., says: "The bill of exchange is a cause of action—a contract by itself—which binds the acceptor in the hands of an endorsee for value; and I conceive it would be altogether contrary to the principles of the law which regulates such instruments that they should be valid or not according as the consideration between the original parties was good or bad, or whether, in the case of a corporation, the consideration in respect of which the acceptance is given is sufficiently connected with the purpose for which the acceptors are incorporated. It would be inconvenient to the last degree if such an inquiry could be gone into. Some bills might be given for a consideration which was valid, as for work done for the company and others as a security for money obtained on loans beyond their borrowing powers. It would be a pernicious thing to hold that, in respect of the former, the corporation might be sued by an endorsee, but in respect of the latter not."

Whether we consider the question in the light of the nature and objects of the ordinary grants of municipal power, or in the light of the purposes which led to the invention and which sustain the use of negotiable paper with the qualities attributed to it by the law-merchant, we are alike led to the conclusion that the mere power to create a municipal liability for ordinary municipal purposes does not carry with it as an incident the authority to raise loans by the issue and sale of commercial obligations. The implied power to issue vouchers or evidences of indebtedness for authorized and valid municipal debts undoubtedly exists, and it may be true that such vouchers or evidences of indebtedness, though put in the form of negotiable paper, are not, for that reason, void, but if not void it is clear that they derive no additional force from that circumstance.

The only safe, as well as sound, doctrine is that there is no power in a municipal corporation, as incidental to the execution of its ordinary duties, to invest its vouchers, or notes, or bonds, with the character of commercial paper. By statute or usage they may be transferable, but the transferee always takes instruments thus issued, whatever their form, cum onere. We are not now referring to municipal bonds, negotiable in form, issued by express legislative authority; these possess, according to the settled law of this country, all of the incidents of commercial paper.

We have looked closely into the American cases against municipal and public corporations which hold that it is incidental to the power to create a debt to give a note or bond in payment of it, but we have found no judgment which holds that the note or bond thus issued partakes of that quality of commercial paper which protects an innocent holder for value from defences or equities to which it would be subject in the hands of the payee. What we wish distinctly to hold is that this supreme and dangerous attribute of commercial paper cannot be imparted to the issues of municipal corporations, whatever their form, unless the power to do so is plainly conferred, either expressly or by implication, by the legislature, and that no such implication exists in respect to debts or liabilities arising from the discharge of ordinary municipal duties.

The argument against a general implied power in municipalities to issue commercial paper with all of the incidents of negotiability, may be briefly summarized as follows:

For hundreds of years the original of our municipal corporations have existed in England without it ever being contended or held that they could, without express authority from parliament, issue such paper. On the contrary, it is there alike conceded and decided that such authority is necessary as the basis of the power. And such has been the view always practised upon in this country from the earliest period until a very recent date. The soundness of this view is strengthened by the almost invariable practice of the legislature to confer, when it is deemed expedient, upon municipal and public corporations, in express terms, the power to borrow money and issue bonds or negotiable securities therefor.

It is a non sequitur, as applied to municipal and public corporations, to affirm that this power to create debts implies the power to give a negotiable bill, bond, or note therefor, which shall be invested with all the incidents of negotiability. Such an implied power is denied in England even as to private corporations organized for pecuniary profit (other than banking or trading corporations), and this demonstrates that the alleged implication of such a power in municipal corporations is neither logically nor legally sound. But if it be conceded that,

as respects private corporations, the American doctrine is otherwise, and that it is rightly so, still it does not follow that the same rule does apply, or ought to apply, to municipal corporations. They are not created for trading, commercial, or business purposes. Private corporations are more vigilant of their interests than it is possible for municipal corporations to be. The latter are in their nature governmental agencies, having in general but one resource with which to meet their liabilities, and that is by taxation, and it is upon this resource that creditors must be taken to rely. The frauds such a doctrine will enable unscrupulous officers successfully to practice, ought to weigh with decisive force against its unnecessary judicial entertainment.

It is a power without assignable limits, intrinsically dangerous, and one which will not fail to prove baneful in the last degree. Courts, when called upon to establish a new doctrine, ought to consider not only its nature, but its consequences, and cannot properly disregard the lessons of experience. A judge may well tremble when he contemplates in the light of recent experience the disasters which such a doctrine will bring upon our municipalities when it shall become generally known that such a tremendous power to Schuylerize them is lodged in the hands of their temporary officers.

Sound policy and sound legal principles are generally coincident, and so it is here. If the power to issue negotiable paper is needful or expedient for our municipalities, let it be given by the legislature that can prescribe the limits, purposes, and conditions of its exercise, and provide for the payment of the liabilities which are thus authorized.

And, finally, the argument against the existence of a general implied power in municipalities to issue commercial paper becomes, as it seems to us, absolutely conclusive in view of the rule, wisely settled, that corporate powers, especially powers whose exercise looks to the creation of public burdens, are to be strictly construed, and that however convenient at times such a power might be, it is one which is not necessary (as shown by universal experience and practice in England, and generally in this country) to enable the corporation to exercise its ordinary functions, or to carry into effect the purposes for which it was created. It is, therefore, a power which does not exist.

Our justification for this extended discussion is found in the fact that the doctrine here combated is struggling for admission into our jurisprudence. It is one which, as we conceive, is founded in a radical misconception of sound legal principles, and one, moreover, whose consequences, if it shall be incorporated into our general law, cannot be contemplated without anxiety.

It follows that, since the defendant city had no power to borrow money, in the manner

attempted, to erect the wharf or to improve the streets, the bonds issued therefor are not legally binding upon it, and there can be no recovery upon them. Bateman v. Mid-Wales Ry. Co., supra; Thomas v. Port Huron, 27 Mich. 320; Hackettstown v. Swackhamer, 37 N. J. Law, 191; Regina v. Lichfield, 4 Adol. & E. (N. S.) 891, 906; Mayor, etc., v. Ray, 19 Wall. [86 U. S.] 468, 480, per Bradley, J.

It will not validate these bonds, so as to make them the basis of a recovery, even if it be shown that the money borrowed was in each instance used for the purpose for which recited in the bonds to have been borrowed. But the plaintiff may amend and add in respect of these bonds counts in the nature of counts for money had and received. Adhering to the decision of this court (Treat, J.) in Wood v. City of Louisiana [Case No. 17,948], at the last term, the present holder of the bonds will then be treated as the assignee of the original holder or payee in respect of the money actually lent to the city; and if, after the city obtained it, the same was in fact expended for the erection and repair of wharves, or the improvement of streets, or, possibly, if expended for other authorized municipal purposes under the authority of the city council, the amount advanced, with lawful interest, less payments received on account thereof, may be recovered. Dill. Mun. Corp. § 730; Paul v. Kenosha, 22 Wis. 266; Shirk v. Pulaski Co. [Case No. 12,794]; Oneida Bank v. Ontario Bank, 21 N. Y. 490; Mayor, etc., v. Ray, 19 Wall. [86 U. S.] 468, 484, per Hunt, J.

The case might be different, even in this aspect of it, if the contract was one expressly prohibited by statute; but this is a question not unattended with difficulties which it is not necessary to consider.

II. The other class of bonds, known as "Road Improvement Bonds," were issued in renewal of bonds issued by the city in payment for stock subscribed to certain companies organized to build gravel roads from the defendant city to points in Missouri. Subscriptions to the stock of such companies were expressly authorized by the act of the legislature of February 24, 1857 (Acts 1857, p. 302), quoted at large in the statement of the case.

Under the true construction of this act, in view of the general legislation of the state of Missouri at this period on the subject of municipal aid to railway and other companies; the almost universal practice under such legislation to issue bonds for debts of this kind; the practical construction put upon this act by the city; the special nature of the authority given; the limited amount of tax authorized by the charter to be laid for the ordinary uses of the municipality, and the decisions of the supreme court of the United States as to the scope of the power to issue bonds to pay for stock subscriptions in railways, and the general tenor of the

·judgments of the supreme court of the United States on the subject (Lynde v. Winnebago Co., 16 Wall. [83 U. S.] 6, 12; Police Jury v. Britton, 15 Wall. [82 U. S.] 572; Dill. Mun. Corp. §§ 106, 107, 407, and notes), and that the inference of the power to issue bonds is in no way inconsistent with the provisions of the act—my judgment is (Treat, J., dissenting on this point), that the city was authorized to issue bonds in payment for the stock subscribed in those companies; that it would be liable to a general judgment on such bonds, and that on those bonds falling due they might be renewed by other bonds.

The demurrer to counts 1 to 10 of the petition is sustained; to counts 12 to 17, overruled, with leave to amend, if the plaintiff is so advised.

Judgment accordingly.

TREAT, District Judge (dissenting). I dissent as to the last class of bonds named, but fully concur as to the other bonds. True, the dicta of the supreme court justify the conclusion in that respect reached in the opinion just delivered; yet a rigid analysis might possibly show distinguishing features. If the power conferred on a municipal corporation to do certain work, or make specified improvements, is not accompanied with the power to borrow money or issue bonds—especially where a limit on the power to tax for such purposes is made—it seems untenable, as a legal proposition, that such a corporation may proceed beyond the limits of taxation permitted, not only to incur a debt therefor, but to borrow money and issue negotiable securities, cutting off all the equities between the original parties. The various legislative enactments whereby municipal corporations are created grant different powers. Some are framed on a non-debt-creating policy, so that those who insist upon immediate expenditure shall pay for the same at once, and not create obligations for another generation or subsequent voters or property-holders to pay. Other charters are framed so as to allow borrowing, looking to prospective benefits from present improvements, and, therefore, permitting the payment therefor to be postponed. Restrictions on taxation would be useless if unlimited borrowing were permitted. It is for the legislative power to determine when borrowing is permissible, and for what purposes, and to what extent, and in what form evidences of indebtedness may be issued. The rulings of the supreme court of the United States concerning municipal bonds, whereby the equities of the original transaction are not open to inquiry when the bonds are held bona fide and for value by others than the original holder, make it the more important to look closely into the powers under which such bonds are issued.

I can detect no controlling reason for the distinction between bonds issued for improvements made directly by the city and bonds issued in payment of subscriptions to the stock of a company empowered to make road or other improvements, unless the broad doctrine is to prevail that the power to subscribe for such stock is to be held to carry with it the power to issue bonds in payment thereof, while the power to make improvements directly does not imply the power to issue bonds to pay therefor.

If there were in the city charter, or in the charter of the railroad corporation, any authority for the city to borrow or issue bonds in payment of a subscription to shares of stock, then another proposition would be presented. In the absence of any authority beyond that to subscribe for such shares, it seems to me that the equities of the original transaction cannot be cut off by issue of negotiable securities for the payment thereof. The argument ab inconvenienti, always a dangerous one, cannot help out the absence of authority to borrow and issue negotiable securities. The holders of bonds under such a state of legislative enactments must rely for recovery on the doctrines announced in the opinion delivered in the case of Wood v. City of Louisiana [supra].

Hence my view is that the last class of bonds stand in the same position as the other bonds sued on, and the rulings with respect thereto should be the same, viz.: That the equities are fully open for consideration with respect to all of said bonds, so that the money really advanced for legitimate purposes may be recovered as in assumpsit, and not formally on the bonds, which were issued without authority.

[For a subsequent hearing, see 1 Fed. 353.]