Merrimack, }
Dec., 1899. }

CATE *v.* MARTIN *& a.*

The statutory provision that the mayor of a city shall have a negative upon the action of the aldermen in laying out highways, and in all other matters, does not apply to a determination by the board of aldermen of the election of a member thereof.

PETITION, for *mandamus*, filed at April term, 1899. Facts found by the trial court. John W. Sanborn was declared elected

an alderman of Ward 2 of the city of Concord, at the municipal election in November, 1898. His election was contested by the plaintiff, who claimed to be elected instead of Sanborn, and a hearing was had before the aldermanic board, January 31, 1899. At this hearing the following resolutions were adopted by a majority vote of the aldermen :

"*Resolved*, That Ross W. Cate, having received a plurality of the votes cast for alderman in Ward 2 in said city, at an election held on the eighth day of last November, is entitled to a seat in this board, and John W. Sanborn, not having been elected at said election, is not entitled to a seat in this board.

"*Resolved*, That the clerk is instructed to strike out of his records the name of John W. Sanborn, as alderman from Ward 2, and substitute in place thereof the name of Ross W. Cate, and further to notify said John W. Sanborn and said Ross W. Cate of this resolution at once."

The mayor vetoed the resolutions. On the question of their passage over the veto, eight aldermen voted in the affirmative and six in the negative ; but less than two thirds of the aldermen elected having voted in the affirmative, as required by section 7, chapter 47, of the Public Statutes, the resolutions failed to pass.

At a meeting of the mayor and aldermen on February 14, 1899, Alderman Dudley presented a paper, signed by six members of the board, protesting against the right of John W. Sanborn, of Ward 2, to act as an alderman from said ward ; also another paper setting forth that Ross W. Cate had taken the oath of office as alderman before R. E. Walker, justice of the peace. It was duly moved that said papers be placed on file, and the motion was carried. The mayor vetoed the action of the board, and the motion failed of a passage over the veto — six aldermen voting in the affirmative, and four in the negative.

The clerk did not notify Cate that he was declared elected, nor Sanborn that he was declared not elected. Cate was at the hearing, and the mayor understood that he then claimed to be entitled to the seat. He was not present when the resolutions were passed.

Since the resolutions were vetoed, and prior to the bringing of this suit, Cate has made no claim, except as above, to the mayor, to the city clerk, or to Sanborn, that he should be allowed to exercise his rights as an alderman. He has not presented himself to take his seat at any meeting of the board, nor requested the mayor to recognize him as an alderman since the resolutions were vetoed. In vetoing these resolutions, the mayor acted in good faith, believing that the ballots, as they existed on the day of the election, showed that Sanborn was legally elected.

If upon the foregoing facts Cate is entitled to his seat in the board of aldermen, the *mandamus* should issue; otherwise, it should not.

*Streeter, Walker & Hollis,* for the plaintiff.

*Eastman & Hollis* (with whom were *Martin & Howe*), for the defendants.

The scope of the mayor's veto power has never been defined by a decision of the New Hampshire courts. It is established by statute in the following words: "He [the mayor] shall have a negative upon the action of the aldermen in laying out highways, and in all other matters; and no motion can be passed or appointment made by the board of aldermen over his veto, unless by vote of two thirds, at least, of all the aldermen elected." P. S., c. 47, s. 7. What the legislature intended by this plain and explicit language is the question now before the court; and this intention is to be ascertained from competent evidence, as in the construction of a will or other written instrument. *Edgerly* v. *Barker*, 66 N. H. 434, 447. We maintain that conclusive evidence of this intention is found in the plain and unmistakable expression of the statute itself.

"The first and most elementary rule of construction is, that it is to be assumed that the words and phrases are used in their technical meaning, if they have acquired one, and in their popular meaning if they have not, and that the phrases and sentences are to be construed according to the rules of grammar; and from this presumption it is not allowable to depart, unless adequate grounds are found, either in the context or in consequences which would result from the literal interpretation, for concluding that that interpretation does not give the real intention of the legislature." End. Stat. 4.

In this case the mayor's powers are clear and well defined. There is nothing in the context to warrant the conclusion that the literal interpretation is not the correct one. Are the consequences which follow a literal interpretation of such a nature as to justify the adoption of another? We think not. It was the evident intent, for an entirely proper and sensible reason, to give the mayor very liberal powers.

The municipal body lies midway between the selectmen and the state government. It is a natural growth from the board of selectmen — its corresponding part in the government of towns. We there have a board of three men, homogeneous, two of them alike in every respect, just as one alderman has precisely the same

rights as his fellows; and a third who differs from the rest only in being chairman and presiding officer. This chairman has a vote, but he may be outvoted by the other two, who compose two thirds of the board, precisely as the chairman of the board of aldermen may be outvoted.

The mayor, moreover, is the direct representative of all parts of the city. He is selected from the whole city for his fitness to direct and restrain the action of the aldermen, and is presumed to have broader experience, capacity, and intellectual powers than the rest of the board. A reading of the statutes plainly shows his unusual and, in some cases, arbitrary powers. P. S., *cc.* 46–50.

The contention that our municipal bodies work on the model of the state legislature is incorrect, for the legislature is presided over by one of its own number, chosen by the members, who has no judicial or executive power and no veto over its resolutions. The veto power lies in the governor. The presiding officer of the board of mayor and aldermen has judicial and executive functions. Like the governor, he has a veto power, and he is elected by the people; unlike the governor, he is a member of the board of aldermen, presides over its deliberations, and has a voice in all its affairs. It appears, therefore, that the municipal council is unlike the state legislature in the very characteristics now under discussion, and the value of analogy fails with the dissimilarity of the two bodies. A New Hampshire municipal council is *sui generis*, and its powers are to be construed in the light of its own peculiar conditions.

It should be borne in mind that the mayor is not the servant of the board over which he presides, like the speaker of the house of representatives. He is elected by the people as a check upon the aldermen, and he is, therefore, its responsible restraining head for all purposes unless he is overridden by a two-thirds vote. The law provides that he " shall preside " and " shall have a negative " on the action of the aldermen. It makes no difference if his powers are more extensive than those of any other officer in the state, so long as the legislature, in giving him express authority, did not transcend its constitutional limitations. If it is good sense to give the mayor unusual authority in some directions, it is equally sensible to extend that authority to other similar matters. We are inclined to agree with the statement contained in the plaintiff's brief, to the effect that his authority extends to placing a negative upon an attempt to reverse his ruling on a point of order, or upon a motion to adjourn, or anything else that may properly come before the board. He cannot dictate what shall be done, but if it seems best to him not to take up a certain piece of business at a certain time he can forbid it, not absolutely, but un-

less a substantial majority is of a contrary opinion. We contend
that it is not a question for the court to determine whether the
powers of the mayor in this direction are too extensive. That
question was for the legislature. Of the wisdom of the statute
the court can say nothing. It is not responsible for the soundness
of the laws it interprets.

It is apparent that the legislature meant to give to the mayor
extraordinary power in restraining action, both legislative and judi-
cial, and his exercise of the veto power is a very common and
well defined method of restraining unwise action. The legislature
knew it well, for their own acts had to pass through the same
test. In no conceivable case could the restraining influence of a
broad-minded man, in whom the people of the whole city have ex-
pressed their confidence by their votes, be better exercised than in
an election case. If ever the aldermen need the restraint of their
guiding spirit, it is in the exercise of this delicate task.

It is contended, however, that each "branch" of the city coun-
cils is made the final judge of the election of its members. P. S.,
c. 48, s. 11. So much we admit; but the question remains:
Does the word "branch" include the mayor? In discussing the
question of the veto power, the plaintiff goes deeply into a com-
parison of the early charters, commissioners' reports, etc., under-
taking to construe this statute in the light of its origin. This
course is frequently wise, but it is permissible only where there is
doubt as to the meaning of the statute under consideration. A
construction of this statute, in all its parts, as it was originally
passed and as it now exists, leaves no doubt as to its meaning.
In the second section following that which provides the veto
power is found the following: "No member of either branch,
except the mayor, shall receive any compensation for his services,"
etc. P. S., c. 48, s. 13; G. L., c. 46, s. 13. Here is a plain state-
ment, intimating in unmistakable terms that the mayor is a mem-
ber of one "branch." The use of the same term "branch" in
three successive sections (11, 12, and 13) cannot be considered an
accident. The legislature must have used the term in the same
sense in each instance. Nothing but the plainest evidence would
warrant a different conclusion. Against such evidence as this,
the elaborate argument of the plaintiff cannot prevail. The con-
clusion is irresistible that the legislature considered the mayor a
member of the aldermanic board. In addition, there are other sec-
tions which tend to show that the legislature intended the mayor
and aldermen to constitute one branch. P. S., c. 46, ss. 2, 3; Ib.,
c. 47, ss. 4, 11. The cases cited in the plaintiff's brief, holding
that the veto power is limited in its scope, will be found upon
examination to have little force in the present case. The differ-

ence in the provisions of the statutes is so great as to destroy their value as precedents. To quote from one of these very cases: "Fortunately in this case, as in all such cases, precedents do not largely fetter, nor will the present decision be likely to form a precedent to affect the interpretation of identical provisions in any future charter." *State* v. *Langdon*, 68 Conn. 522.

The separate functions of the mayor as chief magistrate of the city, and as a member of the aldermanic branch of the city councils, are well illustrated in section 14, chapter 48, of the Public Statutes: "The executive powers of the city and the administrative powers of police, except when vested in the mayor, shall be exercised by the mayor and aldermen," etc. The mayor is not *ex officio* a member of the board of aldermen. He is a member by express act of the legislature. Independent of and in addition to this membership, he has important duties as mayor. It is idle to contend that the mayor is not to pass upon the election of the aldermen because they do not pass on his election. The statute provides such tribunals as the legislature sees fit. It gives the mayor a veto over all matters concerning the aldermen, and gives the aldermen, with the common council, a voice in determining his election. We do not claim that the mayor is an alderman. He is a member of the board for certain purposes, *i. e.*, for the purpose of sitting and acting with them, and negativing such acts as seem to him unwise or wrong. *Brown* v. *Foster*, 88 Me. 49, shows just how the mayor is a member of the aldermanic branch: "It is to the extent of such powers as are specially committed to him, and no further, that he is a part of the city council."

It is true that assemblies, conventions, and legislative bodies are usually the final judges of the election of their own members. This is so for reasons of policy, in order that elections may be passed upon speedily and not be delayed by appeals to the courts. But this is no reason why the legislature may not provide some other expeditious way of settling the matter. Thus, while the mayor is much more intimately connected with the aldermen, the common council is authorized to sit with the aldermen on the question of his qualification. In the present case, there is no reason why the general rule should supersede the special rule provided by the legislature, for the mayor sits with the aldermen and deliberates with them concurrently, so that the result is as speedy and definite as if he were not allowed to take part in the proceedings.

BLODGETT, C. J. The statutory scope of the veto power conferred upon the mayors of cities in this state is found in section 7, chapter 47, of the Public Statutes, which provides that "He shall have a negative upon the action of the aldermen in laying out

highways, and in all other matters; and no vote can be passed or appointment made by the board of aldermen over his veto, unless by a vote of two thirds, at least, of all the aldermen elected."

While this sweeping language, standing alone and taken by itself, is apparently plain and explicit, its interpretation, nevertheless, does not depend upon any one rule alone; for statutes, like all other written instruments, are to be interpreted by the weight of competent evidence, a part of which may bear more or less strongly in a given direction, and another part in a different direction, thus making the result dependent upon the product of both combined. In other words, the primary object in construing statutes being to ascertain the intention of the legislature in their enactment, resort is to be had to their language, the context, the subject-matter, the effects and consequences, or the spirit and reason of the law.

In the light of these rules, and conceding, as the defendants claim, that a municipal council is largely *sui generis* and its powers to be construed accordingly, we are of opinion that the defendants' contention, that the veto power of a mayor extends to and embraces a decision of the board of aldermen as to the election of one of its members, cannot be sustained. Further than this we are not required to go; for whatever the language of the statute giving the mayor a negative "upon the action of the aldermen in laying out highways, and in all other matters," may mean, and whether it would or would not be competent for the legislature to give to the executive of a city a veto upon the action of the legislative branch of the city government sitting as a court in the performance of a judicial duty, it is enough to satisfy the present contention if the decision of a contested election case by the aldermen is not embraced in the phrase, " in all other matters "; and in support of the conclusion that it is not, we cannot but regard the evidence as decisive.

The mayor of a city is not an alderman or councilman of the city in any general or proper sense of those terms. He is designated in the statutes as the " principal officer " and the " chief executive " of the city ( P. S., *c.* 46, *s.* 3 ; *Ib.*, *c.* 47, *s.* 5) ; and both properly and primarily his duties are executive and administrative. *Martindale* v. *Palmer*, 52 Ind. 411, 413 ; *Jacobs* v. *Supervisors*, 100 Cal. 121, 135. He is not a member of either branch of the city councils unless expressly made such by law (Tied. Mun. Cor., *s.* 96) ; and when this is the case, it is " to the extent of such powers as are specially committed to him, and no further, that he is a part of the city council." *Brown* v. *Foster*, 88 Me. 49 ; *People* v. *Ransom*, 56 Barb. 514, 516 ; *Mills* v. *Gleason*, 11 Wis. 470, 476 ; *State* v. *Porter*, 113 Ind. 79. He is " not one of its own members in the sense in which an alderman is " (*Garside* v. *City*, 12 N. Y. Supp. 192, 195 ;

*Winter* v. *Thistlewood*, 101 Ill. 450, 452) ; nor has it been understood that he is to be counted in determining the presence of a quorum. *Attorney-General* v. *Shepard*, 62 N. H. 383 ; *Somerset* v. *Smith*, 49 S. W. Rep. 456 (Ky., 1899).

Applying the principles of these authorities (and none have been found to the contrary) to the statutory provisions relating to mayor and aldermen cited in behalf of the defendants, the result is indubitably to establish the proposition that while the mayor is a constituent part of the aldermanic board for some special purposes, he sits and acts in the board not in the capacity of an alderman, but in the capacity of *ex officio* presiding officer, and exercises those powers only which have been specially committed to him as the chief executive of the city.

However extensive such powers may be in the present case, and regardless of the authorities to which reference has been made, the legislative understanding that the mayor should not be regarded as an alderman in contested election cases, at least, sufficiently appears from the statute enacting that the board of aldermen "shall be the final judge of the election and qualification of its members" (P. S., *c.* 48, *s.* 11), because the authority thus vested in the aldermen does not extend to the election of mayor, of which the city councils in joint convention are made the judges by section 3, chapter 47, of the Public Statutes, and because, under section 11, chapter 48, each alderman is not only made a judge of the election of his fellow-members, but they are made the judges of his election also. And the same conclusion as to the legislative understanding of the mayor's membership is evidenced by the further provision of section 11, that each branch of the city government, in case of a vacancy therein, "shall call a new election," because special provision for the filling of a vacancy in the office of mayor was made elsewhere and by another tribunal. Laws 1895, *c.* 41. Such, also, would seem to have been the understanding of the defendant mayor himself, for he did not assume to act as an alderman in the election before the board, but solely as mayor.

While these citations amply demonstrate that the aldermanic branch of the city councils, within the meaning of section 11, is the board of aldermen exclusive of the mayor (and if this be so his veto power cannot apply, because the judgment of the board would not then be final), they also afford convincing proofs that the mayor's veto power was not intended to extend to a decision by the aldermen of a contested election case. Having made such a decision an imperative finality, it is incredible that the legislature would intentionally stultify itself and emasculate the statute by making it subordinate to the arbitrary caprice of an executive officer, acting solely in an executive capacity, and subject to no supervis-

ing power. If, however, the contrary were true, and the provision giving the mayor "a negative on the action of the aldermen in laying out highways, and in all other matters," were susceptible of the broad construction put upon it by the defendants, it is not perceived upon what ground the provision could be sustained. In a contested election case, as in all other cases, it is the constitutional right of the contestants to have the issue between them settled by judicial action; and of this right they cannot be lawfully deprived by any legislative enactment. The veto power is not, and has never been understood to be, a judicial power. To all intents and for all purposes, it is a franchise of the executive department alone, and may be exercised by its possessor at his pleasure, and without consent, trial, or notice. The adjudication of legal rights in this manner cannot be tolerated under our system of government, or under any other in which there has not been a total abolition of justice and fundamental legal principles.

But there is no solid ground for the defendants' construction of the provision under consideration. It is no less true now than it was in the time of Lord *Coke* that "the laws consist not in being read, but in being understood." 8 Co. 167. "When the legislature enacts that each branch of a city government shall be the judge of the elections of its members, the inference is that they copied the language from the constitution, understanding that it would mean in the statute what it means in the constitution, and intending that municipal legislative bodies, created, organized, and working on the model of the state legislature, shall have the same powers as judges of the elections of their members. It is also probable that, for reasons of public convenience in the transaction of the affairs of cities, the legislative intention was to establish a special tribunal for the determination of such cases, which would act expeditiously, and without the delays ordinarily incident to judicial procedure." *Attorney-General* v. *Sands*, 68 N. H. 54, 57. See, also, *State* v. *Newark*, 1 Dutch. 399, 415. It has never been supposed that the veto power granted the governor of this state by the constitution extended to the qualifications or elections of the members of either branch of the legislative department, concerning which the constitution declares that each branch shall be the judge; and it would be an extraordinary prerogative, indeed, if the legislature has invested the mayors of cities with a more extensive veto power than our constitution has conferred upon the governor, or the national constitution upon the president. Nothing but the most decisive evidence would warrant such a conclusion; and this the defendants have failed to supply.

In fact, their contention is substantially based upon the proposition, that because the mayor is empowered by the statute to inter-

pose his veto upon the judicial act of the aldermen in the laying out of highways, and in all other matters, he may therefore lawfully interpose it upon their judicial action in a contested election case. But this proposition is utterly untenable. Its reasoning is fallacious and its conclusion unsound. Things which are similar in some respects are not the same. Whether it was competent for the legislature to empower the mayor with a negative upon the laying out of a highway by the aldermen, need not now be determined. As has been previously stated, we are required to go at this time only far enough to meet the exigencies of the case before us ; and for this purpose, we think no other answer to the proposition is necessary than to call attention to the pregnant fact that the legislature has not anywhere enacted that the decision of the aldermen in the laying out of highways shall be final, but, on the contrary, it has expressly given to any person aggrieved by the decision of city or town authorities in laying out or altering highways, the right of appeal therefrom to this court. P. S., *c.* 68, *s.* 2 ; *Ib., c.* 46, *ss.* 1, 2. These considerations so broadly distinguish the one case from the other as to bring to naught any analogy between them. Other answers to the proposition, however, are not lacking.

A sufficient foundation for the petition is furnished by the reported facts in respect of a demand upon the mayor to perform his duty.

Nothing more need be said of the case. Viewed in any permissible light derived from the decisions, the statutes, the nature and purpose of the veto power as heretofore understood, the consequences which would follow the defendants' construction, the analogy of the city system of government to the governmental system of the state and nation, and the separation and independence of the legislative, executive, and judicial departments enjoined in our bill of rights, the overwhelming weight of evidence leads to the conclusion that the mayor of Concord could not veto the judicial action of the board of aldermen sitting as a court, in a matter of which the statutes have made it the exclusive and final judge.

*Petition granted.*

PIKE, J., did not sit: the others concurred.